**LONG LAW, P.C.**
James Austin Long (CSB No. 326404)
1401 21st Street, Ste. 5801
Sacramento, CA 95811
Tel:     315-991-8000
jlong@long.law

**WITTELS MCINTURFF PALIKOVIC**
Daniel Kieselstein* (NYB No. 5701156)
305 Broadway, 7th Floor
New York, New York 10007
Tel:     914-775-8862
djk@wittelslaw.com
*Attorneys for Plaintiff*

*\*Pro hac vice application forthcoming*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DEVIN ROSE,** On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> **X.AI LLC** and **X.AI Corp.,** <br><br> Defendants. | Case No.: <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Devin Rose ("Mr. Rose" or "Plaintiff"), by his undersigned attorneys, Long Law, P.C., and Wittels McInturff Palikovic, brings this consumer protection action in his individual capacity and on behalf of a class of consumers defined below against Defendants X.AI LLC and X.AI Corp. (hereafter, "Defendants" or "X.AI") and hereby alleges the following with knowledge as to his own acts and upon information and belief as to all other acts:

**INTRODUCTION**

1.      This proposed class action challenges X.AI's use of deceptive and illegal "automatic renewal" tactics to trick consumers into paying for unwanted, pricey subscriptions to Grok, X.AI's artificial intelligence chatbot. X.AI sells Grok subscriptions through three paid tiers: SuperGrok Lite, SuperGrok, and SuperGrok Heavy (the "SuperGrok Subscriptions"). X.AI, an artificial intelligence company, intentionally misleads consumers into thinking that a SuperGrok Subscription lasts only for a discrete period and is easy to cancel. The truth is that X.AI hides its supposed "disclosures" that SuperGrok Subscriptions automatically renew, and X.AI intentionally makes canceling a SuperGrok Subscription difficult and confusing. X.AI hides the truth both before and after consumers purchase a subscription, and any disclosures it provides fall far short of the minimum standard required under applicable law.

2.      X.AI uses the same internet-based enrollment and cancellation process for all three tiers of SuperGrok Subscriptions. These processes are commonly referred to as "flows" (i.e. the enrollment flow, and the cancellation flow). These flows function identically, regardless of Subscription tier, and both the enrollment and cancellation flows exhibit intentional design choices that have been put in place to trap consumers into a cycle of repeating monthly payments to X.AI.

3.      X.AI's subscription-related design practices are not happenstance. Knowing that "[b]ecause subscriptions are automatically renewed, consumers who are inertial or not fully attentive may continue to pay for services they no longer value[,]"[1] unscrupulous sellers resort to unlawful practices—including free trials that are hard to cancel and then convert into paid subscriptions,

---

[1] Liran Einav, Benjamin Klopack & Neale Mahoney, *Selling Subscriptions*, Nat'l Bureau of Econ. Research (NBER), Working Paper No. 31547 (Aug. 2023), https://www.nber.org/papers/w31547.

1

inadequate disclosure of recurring charges, maze-like cancellation flows, and other deceptive tactics—to lure customers into paying for subscriptions they do not actually want.

4.     As explained herein, X.AI's embrace of these deceptive tactics violates California's Automatic Renewal Law, the Electronic Fund Transfer Act, and the common law.

5.     For example, to protect consumers from deceptive autorenewal practices, California enacted its Automatic Renewal Law. *See* Cal. Bus. & Prof. Code §§ 17600–06 (the "ARL"). The ARL requires sellers of automatically renewing subscriptions to provide, *inter alia*, "clear and conspicuous" disclosures about the autorenewal plan in "visual proximity" to the request for consent to charge the customer's payment method, obtain consumers' "affirmative consent" to autorenewal, provide a "cost-effective, timely, and easy-to-use mechanism" for canceling the subscription, provide a "prominently located direct link or button" for cancellation or pre-formatted cancellation email, and, where the initial term of a subscription is one year or longer, notify customers that their subscription will renew 15 to 45 days before it does.

6.     The ARL is enforced through, *inter alia*, California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.* The FAL renders unlawful any untrue or misleading statement made in advertising a good or service—such as misstating the price, fact of autorenewal, renewal terms, or cancellation policy—when the seller knows, or should know, that the statement is untrue or misleading. *See id.*

7.     X.AI engages in numerous deceptive tactics barred by the FAL, ARL, and other law in at least four ways.

8.     ***First***, X.AI does not clearly and conspicuously, and in visual proximity to the request for payment authorization, disclose the automatically renewing nature of its subscriptions, or obtain consumers' affirmative consent to autorenewal prior to enrollment.

9.     ***Second***, X.AI makes canceling exceedingly difficult and requires consumers to navigate—with no help from X.AI—a lengthy and confusing process of at least ***nine steps*** across at least ***seven screens*** in which a consumer must click "cancel" at least ***five times***. This process obstructs efforts by consumers to cancel their subscriptions and leads to unwanted automatic subscription renewals. X.AI thus does not provide a "cost-effective, timely, and easy-to-use mechanism for

CLASS ACTION COMPLAINT

cancellation" by which the consumer can cancel, nor a "prominently located direct link or button" for cancellation or pre-formatted termination email that the consumer can send to X.AI. X.AI also does not include a clear and conspicuous description of the "cancellation policy" in visual proximity to the request for consent.

10.    **Third,** X.AI does not provide a post-purchase acknowledgment email including "the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner capable of being retained by the consumer."

11.    **Fourth**, X.AI either does not provide customers notice of upcoming renewals, or does not provide a renewal notice stating that the automatic renewal or continuous service will automatically renew unless the consumer cancels, the length and any additional terms of the renewal period, the amount the consumer will be charged, one or more methods by which a consumer can cancel the automatic renewal, or a link or otherwise reasonably accessible electronic method that directs the consumer to the cancellation process.

12.    The Electronic Fund Transfer Act, 15 U.S.C. § 1693, *et seq.* ("EFTA") is also designed to combat the deceptive tactics X.AI deployed here. The "primary objective" of the EFTA "is the provision of individual consumer rights," which is accomplished through "a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693(b). The EFTA requires X.AI to obtain prior written consent before initiating recurring electronic fund transfers and to provide a copy of that authorization to consumers. *Id.* § 1693e(a). By failing to obtain consent from consumers prior to initiating recurring fund transfers from their accounts as described herein, X.AI violates the EFTA.

13.    All X.AI customers face the same enrollment and cancellation gauntlet and need only be tricked by one of X.AI's traps to end up paying a hefty and unlawful fee for a SuperGrok Subscription.

14.    It is not an accident that so many of X.AI's customers are paying for unwanted subscriptions. It is the desired result of X.AI's intentional and bad-faith design choices. X.AI knows its scheme is tricking customers as hundreds of consumers have complained directly to X.AI or via sites like TrustPilot and Reddit. Upon information and belief, X.AI experiences a high rate of chargebacks

from consumers disputing unwanted charges caused by X.AI's subscription scheme, and it has developed customer service protocols specifically to deal with these complaints.

15.    Despite the clear messages X.AI's customers are sending, Defendants continue to subject consumers to their unlawful subscription scheme and to reap significant monetary benefits from their misconduct.

16.    Only through a class action can consumers like Plaintiff remedy X.AI's unlawful practices. Because the monetary damages suffered by each customer are small in comparison to the much higher cost a single customer would incur in trying to challenge X.AI's improper conduct, it makes no financial sense for an individual customer to bring his or her own lawsuit. Furthermore, many customers do not realize they are victims of X.AI's unlawful acts and continue to be charged to this day. With this class action, Plaintiff and the Class seek to level the playing field, enjoin X.AI's unlawful business practices, and recover the charges X.AI has imposed on them in violation of the law.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and X.AI.

18.    Moreover, this Court has federal question jurisdiction over the EFTA claim pursuant to 28 U.S.C. § 1331.

19.    This Court may exercise supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because all of the claims arise from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

20.    This Court has personal jurisdiction over X.AI because X.AI's corporate headquarters and principal place of business are in Palo Alto, California,[2] which is in this District.

---

[2] X.AI Corp., Notice of Exempt Offering of Securities (Form D), Item 2 (Dec. 5, 2024) (listing Palo Alto address as principal place of business); Space Exploration Technologies Corp., Registration Statement (Form S-1) (May 20, 2026), at 211 (same).

4

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because X.AI resides in this District and is a resident of California, because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District, and because X.AI is subject to personal jurisdiction in this District.

22.    Specifically, upon information and belief, X.AI designed, developed, and implemented the conduct challenged herein from its Palo Alto offices, including its principal place of business and headquarters at 1450 Page Mill Road.

23.    For example, X.AI job postings identify Palo Alto-based roles responsible for SuperGrok Subscriptions, end-to-end consumer-subscription billing infrastructure, Grok's consumer-facing product experience, and product design.[3]

24.    Divisional Assignment. Assignment to the San Jose Division is proper under Civil L.R. 3-2(c) and (e) because a substantial part of the events or omissions giving rise to Plaintiff's claims arose in the counties served by the San Jose Division. Upon information and belief, hundreds of Class Members purchased X.AI's services in the counties served by this Division. Moreover, X.AI conducts substantial business in the counties served by this Division, has marketed, advertised, sold, and provided services in those counties, and has caused harm to Class Members residing in those counties.

## PARTIES

25.    Plaintiff Devin Rose is a citizen of California living in Studio City, California. He was enrolled in a SuperGrok Subscription on or around July 12, 2025.

---

[3] *See, e.g.*, xAI, *Engineering Lead – Consumer Subscriptions*, Greenhouse, https://job-boards.greenhouse.io/xai/jobs/5109691007 (last visited May 26, 2026) (listing "Engineering Lead for Consumer Subscriptions (X Premium & SuperGrok)," for which responsibilities include "[o]wn[ing] the complete billing structure for consumer subscriptions," "[d]esign[ing] and build[ing] sophisticated promotional offer infrastructure and internal tools to supercharge the revenue organization," "[d]evelop[ing] comprehensive communication systems enabling intelligent push, email, and in-app messaging that drive engagement and conversions."); *see also* xAI, *Engineering Lead – Consumer Subscriptions*, Duke Capital Partners Jobs Board (showing this job posted Apr. 17, 2026), https://jobs.dukecapitalpartners.duke.edu/companies/x-ai/jobs/74776360-engineering-lead-consumer-subscriptions (showing date of posting).

5

CLASS ACTION COMPLAINT

26.     Defendant X.AI LLC is a limited liability company registered in Nevada with its principal place of business at 1450 Page Mill Rd, Palo Alto, CA. X.AI LLC is a citizen of Nevada and California.

27.     Defendant X.AI LLC is a wholly owned subsidiary of X.AI Corp.

28.     Defendant X.AI Corp. is a corporation incorporated in Nevada with its principal place of business at 1450 Page Mill Rd, Palo Alto, CA 94304.

29.     X.AI Corp. also maintains an office in San Francisco. On information and belief, X.AI LLC also operates out of that San Francisco office.

30.     At all relevant times, X.AI Corp. has been engaged in the development, operation, management, and commercialization of Grok.

31.     Defendants X.AI Corp. and X.AI LLC together own, control, and operate Grok and the SuperGrok Subscriptions and have acted jointly and in concert with respect to Grok's design, deployment, marketing, and commercialization.

32.     On July 12, 2025, the date Plaintiff was enrolled in a SuperGrok Subscription, Defendant X.AI Corp. owned the trademarks and intellectual property rights for "Grok" and "XAI Grok." Then on July 14, 2025, X.AI Corp. executed an assignment of those intellectual property rights to Defendant X.AI LLC, which was recorded by the U.S. Patent and Trademark Office on August 5, 2025.[4] Defendant X.AI LLC is the current owner of the intellectual property rights for "Grok" and "XAI Grok."

33.     Defendant X.AI Corp. completely controls and dominates its operating affiliate X.AI LLC. X.AI LLC has no separate offices and operates out of Palo Alto, CA and San Francisco, CA with X.AI Corp. On information and belief, a unified executive team employed by X.AI Corp. controls all operational and financial aspects of X.AI LLC. All of the operations and activities related to the conduct challenged herein are directed and executed by X.AI Corp., including the design, implementation, and operation of the enrollment flows, cancellation flows, and customer communications (including post-enrollment acknowledgment and pre-renewal notice, or lack thereof) for SuperGrok Subscriptions.

---

[4] "XAI Grok," United States Patent and Trademark Office, https://tsdr.uspto.gov/#caseNumber=98924975&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch.

CLASS ACTION COMPLAINT

34.     In publicly available filings with the state of California Office of the Secretary of State, including a Statement of Information filed on June 9, 2026, X.AI LLC lists only two "managers or members": X.AI Corp. and Jared Birchall, both of whom list 1450 Page Mill Rd, Palo Alto, CA 94304 as their address.[5] In publicly available securities filings, X.AI Corp. lists Jared Birchall as the "Corporate Secretary and CFO" of X.AI Corp.[6]

35.     Defendants treat X.AI Corp. and X.AI LLC as a unified enterprise. For example, in a complaint filed by X.AI Corp. and X.AI LLC in this District, X.AI Corp. and X.AI LLC defined themselves collectively as "xAI" and repeatedly attributed the development of the Grok chatbot to that collective entity. *See* Complaint, *X.AI Corp.* and *X.AI LLC v. Li*, No. 3:25-cv-07292, ECF No. 1 (N.D. Cal. Aug. 8, 2025) ("*Li*"). The following examples are representative, with emphasis added:

- "Competing alongside OpenAI's ChatGPT, Google's Gemini and China's DeepSeek, ***xAI's newest release—Grok 4***—is one of the most . . . advanced and powerful generative AI systems in the world." *Id.* at ¶ 16.

- "Grok is a conversational generative AI ***developed by xAI***." *Id.* at ¶ 18.

- "xAI operates in a highly competitive landscape for AI models[.]" *Id.* at ¶ 19.

- "xAI's trajectory is unprecedented. It has delivered in a mere two years arguably the most advanced AI model in the world[.]" *Id.* at ¶ 21.

36.     In the *Li* Complaint, X.AI Corp. and X.AI LLC also state without differentiation between them that "xAI hired Defendant." *Id.* at ¶ 81. Attached to the *Li* Complaint was an employment contract, which by the *Li* Complaint's own terms bound both X.AI Corp. and X.AI LLC, *see id.* at ¶ 84 ("X.AI [(meaning both X.AI Corp. and X.AI LLC)] has fully performed its contractual obligations to Defendant under the Agreement"), but which had only a single signatory for the "Company." *See Li*, ECF No. 1-1 at 8.

---

[5] Statement of Information, *X.AI CA LLC*, Entity No. B20260122164, File No. BA20261222184, at 1 (Cal. Sec'y of State filed June 9, 2026) (using X.AI LLC's 'California Alternate' name of X.AI CA LLC").

[6] X.AI Corp., Notice of Exempt Offering of Securities (Form D), Signature and Submission (Dec. 5, 2024), https://www.sec.gov/Archives/edgar/data/2002695/000200269524000003/xslFormDX01/primary_doc.xml.

37. X.AI Corp. also participated directly in the conduct challenged herein. For example, potential consumers may reach the Grok Payment Page (described *infra* at Section D) via "x.ai," a website trademarked to "xAI Corp."

38. Likewise, the X.AI Terms of Service contain a trademark to "xAI Corp."

39. The "Engineering Lead—Consumer Subscriptions" job posting described *supra* at ¶ 23 n.3 likewise lists only "xAI" as the potential employer, with no distinction between X.AI LLC and X.AI Corp.

## FACTUAL ALLEGATIONS

**A.    Background on the Subscription e-Commerce Industry.**

40. The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[7] The sector "has exploded in recent years, by one estimate growing by over 400% over the past decade."[8] In 2025, one leading market intelligence firm valued the subscription economy at $722 billion, and predicted it will reach $1.2 trillion in 2030.[9]

41. Subscription-based business models carry well-documented costs to consumers. In particular, sellers can realize far more profit by locking consumers into recurring subscriptions than by working to improve their products or focusing only on charging consumers for products they actually want. One paper "estimates that inattention and more passive renewal lead to a substantial increase in revenues for subscription services, which could be as high as ***three times greater*** than the revenues they would receive if subscribers were fully attentive and made an active renewal decision each month."[10]

---

[7] *See* Sam Saltis, *How to Run an eCommerce Subscription Service: The Ultimate Guide*, CORE DNA, https://www.coredna.com/blogs/ecommerce-subscription-services.

[8] Emily Stewart, *Companies Love Trapping People in Subscriptions. Savvy Consumers Are Fighting Back.*, Business Insider (July 24, 2025), https://www.businessinsider.com/free-trials-consumers-subscription-economy-2025-7.

[9] Press Release, Juniper Research, *Subscription Economy to Reach $1.2 Trillion by 2030 Globally, Despite Increasing Subscription Fatigue* (Oct. 1, 2025), https://www.juniperresearch.com/press/subscription-economy-to-reach-1tn-by-2030.

[10] *See* Einav et al., *supra* note 1, at 17.

CLASS ACTION COMPLAINT

42.     Seeking to maximize the enhanced revenues associated with subscriptions, many sellers have deployed deceptive sign-up and cancellation flows. As one recent report observed, "[c]ompanies have gotten increasingly savvy at trapping consumers in what are known as 'dark patterns,' drawing them in with a shiny new product or discounted subscription that ends up being burdensome to get out of."[11]

43.     The term "dark patterns," first coined in 2010 by the cognitive scientist Harry Brignull, is a term of art in the field of user-experience ("UX") design, referring to interface strategies intentionally crafted to manipulate consumer choice. The Federal Trade Commission defines dark patterns as "practices that trick or manipulate users into making choices they would not otherwise have made and that may cause harm."[12] A report by Nielsen Norman Group, a globally recognized UX consultancy, defines a dark pattern as "a design pattern that prompts the user to take an action that benefits the company employing the pattern by deceiving, misdirecting, shaming, or obstructing the user's ability to make another (less profitable) choice."[13]

44.     The image on the following page provides examples of commonly employed dark patterns:[14]

---

[11] Ayelet Sheffey, *America's Nightmare of Never-Ending Subscriptions*, Business Insider (Oct. 19, 2024), https://www.businessinsider.com/america-subscriptions-nightmare-recurring-payments-cancellation-company-tricks-trap-customers-2024-10.

[12] Fed. Trade Comm'n, *Shedding Light on Dark Patterns: An FTC Report on How Manipulative Design Is Used Against Consumers*, at 1 (Sept. 14, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800+Dark+Patterns+Report+9.14.2022+-+FINAL.pdf

[13] Maria Rosala, *Deceptive Patterns in UX: How to Recognize and Avoid Them*, Nielsen Norman Group (Dec. 1, 2023), https://www.nngroup.com/articles/deceptive-patterns/

[14] Sarbashish Basu, *What is a dark pattern?  How it benefits businesses- Some examples*, H2S MEDIA (Dec. 19, 2019), https://www.how2shout.com/technology/what-is-a-dark-pattern-how-it-benefit-businesses-with-some-examples.html.

CLASS ACTION COMPLAINT

45.    As the FTC explains, "dark patterns often take advantage of consumers' cognitive biases to steer their conduct or delay access to information needed to make fully informed decisions."[15] The image on the following page provides examples of cognitive biases, including some that X.AI exploits in its enrollment and cancellation flows:

---

[15] FTC, *Shedding Light on Dark Patterns*, *supra* note 9, at 2.

10

46. As the number of sellers using subscription-based business models has grown, so too has the use of dark patterns. According to the FTC:

> For decades, unscrupulous direct mail marketers and brick-and-mortar retailers have relied on design tricks and psychological tactics . . . to get consumers to part with their money or data. As more and more commerce has moved online, so too have these manipulative design practices—termed 'dark patterns'—only grown in scale and sophistication, creating ever greater challenges for consumers.[16]

47. Here, X.AI has deployed dark patterns with great success.

**B.     California's False Advertising Law (Cal. Bus. & Prof. Code § 17500) and Automatic Renewal Law (Cal. Bus. & Prof. Code § 17600).**

48. California law provides statutory safeguards against the deceptive practices challenged here: the FAL and, through the FAL, the ARL. Together, these laws impose strict disclosure, consent, cancellation, and transparency requirements to protect consumers from unwanted subscription charges.

---

[16] FTC, *Shedding Light on Dark Patterns*, *supra* note 9, at 17.

*See* Cal. Bus. & Prof. Code § 17600 ("It is the intent of the Legislature to end the practice of ongoing charging of consumer credit or debit cards or third-party payment accounts without the consumers' explicit consent[.]"); *see also Kasky v. Nike, Inc.*, 27 Cal.4th 939, 951 (2002) ("We have also recognized that [the FAL] prohibit[s] not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.") (citation omitted).

49.     Under the FAL, "[i]t is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, in any . . . publication . . . or in any other manner or means whatever, including over the internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500; *see also Ebner v. Fresh, Inc.*, 838 F.3d 958, 967 n.2 (9th Cir. 2016) ("The FAL prohibits unfair, deceptive, untrue, or misleading advertising[.]").

50.     Under the ARL, a seller must "present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity . . . to the request for consent to the offer." Cal. Bus. & Prof. Code § 17602(a)(1).

51.     The specific "automatic renewal offer terms" and "continuous service offer terms" that must be clearly and conspicuously disclosed are defined by the statute. Those disclosures include that: (1) the subscription or purchasing agreement will continue until the consumer cancels; (2) the description of the cancellation policy that applies to the offer; (3) the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known; (4) the length of the automatic renewal term or

that the service is continuous, unless the length of the term is chosen by the consumer; and (5) the minimum purchase obligation, if any. *Id.* § 17601(a)(2)(A)–(E).

52.     "Clear and conspicuous" is likewise defined by the ARL. It means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." *Id.* § 17601(a)(3).

53.     In addition to making these required disclosures, the company must "obtain the consumer's express affirmative consent to the automatic renewal or continuous service offer terms." Failure to do so is "unlawful." *Id.* § 17602(a)(4).

54.     Also, as of July 1, 2025, the company may not "[m]isrepresent, expressly or by implication, any material fact related to the transaction, including, but not limited to, the inclusion of an automatic renewal or continuous service." *Id.* § 17602(a)(7).

55.     In addition to the pre-purchase obligations detailed above, sellers must comply with the ARL's post-purchase acknowledgment requirements. Specifically, the seller must "provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer." *Id.* § 17602(a)(3). For transactions involving a free trial, the acknowledgment must further disclose "how to cancel." *Id.* The cancellation mechanism described in the acknowledgment must be one of "a toll-free telephone number, email address, a postal address if the seller directly bills the consumer, or . . . another cost-effective, timely, and easy-to-use mechanism for cancellation." *Id.* § 17602(c)(1).

56.     Further, the seller must allow a consumer to "terminate the automatic renewal . . . exclusively online, at will, and without engaging any further steps that obstruct or delay the consumer's ability to terminate the automatic renewal or continuous service immediately." *Id.* § 17602(d)(1). To meet this requirement, a seller "shall provide a method of termination that is online in the form of either . . . [a] prominently located direct link or button which may be located within either a customer account or profile, or within either device or user settings; [or] [b]y an immediately accessible termination email formatted and provided by the business that a consumer can send to the business without additional

13

information." *Id.*

**C. The Electronic Fund Transfer Act**

57. An "electronic funds transfer" means "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). The term expressly includes "[t]ransfers resulting from debit card transactions, whether or not initiated through an electronic terminal." 12 C.F.R. § 205.3(b)(v).

58. The EFTA defines the term "preauthorized electronic fund transfer" as "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(9). As described in the Consumer Financial Protection Bureau's ("CFPB") Official Staff Interpretation of Regulation E, the CFPB Regulation implementing the EFTA, a "preauthorized electronic fund transfer" is "one authorized by the consumer in advance of a transfer that will take place on a recurring basis, at substantially regular intervals, and will require no further action by the consumer to initiate the transfer." 12 C.F.R. Part 1005, Supp. I, § 205.2(k), cmt. 1.

59. The EFTA prohibits preauthorized electronic fund transfers without written authorization. "A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693e(a).

60. Regulation E similarly provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the customer." 12 C.F.R. § 205.10(b).

**D. X.AI's Payment Page Violates the ARL.**

61. X.AI sells the SuperGrok Subscriptions through its website, grok.com (the "Website"), and through its standalone app, Grok (the "App"). X.AI has offered the SuperGrok Subscriptions since

14

on or around February 17, 2025.[17]

62.    X.AI has unique access to its historical enrollment pages. However, in the time since X.AI began offering the SuperGrok Subscriptions, and across all versions of the Website and the App, the checkout page for SuperGrok Subscriptions (the "Payment Page") is substantially similar, and violates the ARL in the same way, by failing to provide conspicuous disclosure of the automatic renewal terms in visual proximity to the request for consent to the offer and by failing to obtain affirmative consent from consumers.

63.    On information and belief, the Payment Page reviewed by Plaintiff prior to purchasing his SuperGrok Subscription was materially similar to the page presented below.

64.    X.AI's Payment Page does not comply with the ARL requirements outlined *supra* at ¶¶ 48–54. Upon information and belief, the Payment Page for all of X.AI's SuperGrok Subscriptions is materially similar to the Payment Page reproduced on the following page:

---

[17]    Kyle Wiggers, *Elon Musk's xAI Releases Its Latest Flagship Model,* Grok 3, https://techcrunch.com/2025/02/17/elon-musks-ai-company-xai-releases-its-latest-flagship-ai-grok-3/.

15

65. The terms and conditions of X.AI's automatic renewal offer are not presented to consumers "clearly and conspicuously" and, as to some of the key terms, are not presented in "visual proximity to the request for consent to the offer." ARL § 17602(a)(1). *First*, the fact that the subscription will continue until the consumer cancels is not stated explicitly and is not stated clearly and conspicuously. Below the "Start trial" button in the bottom-right corner, X.AI states that "[b]y subscribing, you authorize Grok xAI to charge you according to the terms until you cancel." This "disclosure" is not clear and conspicuous because it is not "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other markers that clearly call attention to the language." *Id.* § 17601(a)(3). Instead, this "disclosure" is presented in far smaller type than the surrounding text, in low-

16

contrast, gray font against a white background, overshadowed by the large, high-contrast button above it.

66.     Moreover, this "disclosure" does not include a hyperlink to X.AI's (deficient) Terms of Service, much less a conspicuous hyperlink that is in a strongly contrasting color. Instead, the "Terms" link beneath X.AI's inadequate disclosure directs the consumer to the Terms of Service for *Stripe*, X.AI's payment processor.[18] The Stripe Terms of Service make no mention of the automatic renewal terms X.AI is required to disclose and explicitly govern the customer's relationship with Stripe, not X.AI. Because X.AI's disclosure strongly suggests that by "subscribing" the customer is agreeing to Stripe's terms, and because the disclosure fails to specify that clicking a button labeled "[s]tart trial" would constitute subscribing, a reasonable consumer would not know that they are agreeing to X.AI's terms, let alone the complete automatic renewal offer terms purportedly governing his or her purchase. X.AI's Payment Page thus does not notify the consumer, let alone clearly and conspicuously and in visual proximity to the request for consent (because the disclosure that is in visual proximity is incomplete) that the subscription agreement will continue until cancelled. This violates the ARL.

67.     *Second*, X.AI does not provide *anywhere* on its Payment Page a description of the cancellation policy that applies. Descriptions of the cancellation policy are sufficient when the seller "provide[s] information about how and when [the consumer] could cancel, with hyperlinks to the

---

[18] The unavailability of X.AI's Terms of Service remains regardless of the payment method chosen by the consumer. If the consumer chooses to pay through Google Pay, they are likewise offered (below the same disclosure), a link to Stripe's Terms of Service. If they select "Bank" they are presented an additional disclosure, which states "By clicking 'Start trial' you agree to authorize payments pursuant to these terms," with "these terms" being a hyperlink to the Terms of Service for Link, another payment processor. Like the Stripe Terms, the Link Terms do not provide the automatic renewal offer terms.

The Link Terms' disclosure offers, on X.AI's own Payment Page, a demonstration of what a more compliant disclosure would look like – it correctly identifies the text of the button binding the user and offers a hyperlink to the terms disclosed.

If the consumer clicks the green button on the top right, they again are offered a hyperlink to Link's Terms, and if the consumer chooses to pay by Apple Pay, they are offered a QR code for scanning by their phone to complete payment. There, too, Grok's terms are not made available to the user, who receives the same deficient disclosure as on the original Payment Page.

relevant contact information." *Viveros v. Audible, Inc.*, No. C23-0925, 2023 WL 6960281, at *8 (W.D. Wash. Oct. 20, 2023) (quoting *Hall v. Time*, No. SACV 19-01153, 2020 WL 2303088, at *4 (C.D. Cal. Mar. 13, 2020), *aff'd* 857 F. App'x 385 (9th Cir. 2021)). In *Viveros*, the seller's checkout page "inform[ed] the subscriber that they may 'Cancel anytime' by visiting 'Account Details,' and the paragraph above this language includes a blue hyperlink to [the seller]'s 'Conditions of Use,' which . . . include [seller]'s complete offer terms." *Id.* In *Viveros*, the "Cancel anytime via Account Details" language was emphasized with an underline and placed *above* the request for consent. Here, X.AI's Payment Page does not describe anywhere "how" the consumer could cancel their subscription or provide a hyperlink to relevant contact information. It says only (in language that is not clear or conspicuous, not emphasized in any way, and *below* the request for consent) that the consumer may "cancel anytime." X.AI's Payment Page thus violates the ARL because it does not clearly and conspicuously and in visual proximity to the request for consent describe the cancellation policy applicable to the subscription.

68.    ***Third***, X.AI does not clearly and conspicuously, and in visual proximity to the request for consent, provide "the recurring charges that will be charged to the consumer's" payment method and that the amount charged may change. The amount of the recurring charge ($30) is written in very small font, far smaller than the large banner exclaiming "3 days free" above it. The amount of the recurring charge is thus not presented clearly and conspicuously. The amount of the recurring charge is also not presented in visual proximity to the request for consent but is instead hidden as far as possible from the request for consent, in the opposite corner of the page. The fact that the amount to be charged may change is not stated on the Payment Page at all. If a consumer wished to become aware of this fact, they would have to find X.AI's Terms of Service (which are not reachable through the Payment Page) and then find, on page 8 of that 20-page Terms of Service, a statement that "[w]e may adjust subscription prices periodically. If prices increase, we will provide 30 days' notice, and the new price will apply at your next renewal, allowing you to cancel if you disagree with the change." X.AI thus violates the ARL because it does not clearly and conspicuously and in visual proximity to the request for consent present the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement and that the amount of the charge

18

may change, if that is the case.

69.　　***Fourth***, X.AI does not clearly and conspicuously, and in visual proximity to the request for consent, provide the length of the automatic renewal term, or state that the service is continuous unless the consumer cancels. Instead, as with the amount of the recurring charge, the term of the renewal period (one month) is presented in small font obscured by a large "3 days free" banner above it, and is located on the top left corner of the Payment Page—at the furthest possible location from the request for consent. X.AI thus violates the ARL because it does not clearly and conspicuously and in visual proximity to the request for consent present the length of the automatic renewal term, or that the service is continuous unless the consumer cancels.

70.　　A review of the overall design and structure of X.AI's Payment Page makes clear that X.AI seeks to *deemphasize* the automatic renewal offer terms (when it shows them at all), rather than making them **conspicuous**. X.AI's Payment Page uses the "deliberate misdirection" dark pattern to prevent consumers from making an informed choice. X.AI's intentional design choices that conceal material facts violate the ARL.

71.　　In sum, the X.AI Payment Page fails to obtain consumers' affirmative consent to the automatic renewal terms and contains no mechanism for a consumer to manifest that consent. For example, there is no checkbox that consumers must click to indicate that they accept those terms. *See id.* § 17602(a)(2) (it is unlawful to charge consumers for an automatic renewal "without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms").

**E.　　X.AI's Cancellation Flow Violates the ARL.**

72.　　X.AI's cancellation flow does not comply with the ARL's cancellation requirements, outlined *supra* at ¶¶ 55–56.

73.　　X.AI does not provide a prominently located direct link or button with which a consumer can cancel and does not provide an immediately accessible termination email formatted and provided by the business that a consumer can send to the business without additional information. ARL § 17602(d)(1).

74.　　X.AI does not provide consumers with an acknowledgment describing "how to cancel."

19

*Id.* § 17602(a)(3).

75.    X.AI does not provide consumers with an acknowledgment containing "a toll-free telephone number, email address . . . or . . . another cost-effective, timely, and easy-to-use mechanism for cancellation." *Id.* § 17602(c)(1).

76.    X.AI could not provide an acknowledgment with such an easy-to-use mechanism, because it offers no such mechanism to the consumer.

77.    Instead, X.AI's cancellation flow is deliberately designed to impede cancellation, requiring a consumer to navigate at least ***nine steps***, across at least ***seven screens***, and to click "cancel" at least ***five times***.

78.    On information and belief, the cancellation flow described below is materially identical to that encountered by Plaintiff.

79.    To cancel, consumers must first navigate to X.AI's home page and log into their account.

80.    Then, the consumer must **(1)** hover their mouse over a tiny, unlabeled icon on the bottom left of the home page, as reproduced on the following page and marked with a red arrow for clarity (with profile identifying information redacted in white):

20

CLASS ACTION COMPLAINT



81.    From there, the consumer must **(2)** select "Settings" from the pop-up menu that appears below the icon. That menu is reproduced below:



21

82.    Clicking "Settings" expands a pop-up overlaying the Grok home page. The pop-up defaults to an "Account" page which contains no prominently located direct link or button to effect cancellation, as required by the ARL. Cal. Bus. & Prof. Code § 17602(d)(1). Instead, the consumer must continue the process by clicking either **(3)** the button labeled "Manage" and located to the right of their subscription tier or **(3)** the menu item labeled "Subscription" and located near the bottom left of the pop-up. This pop-up is reproduced below:



83.    Clicking either of those buttons takes the consumer to the Subscription Page within the Settings pop-up. Here, there is still no prominently located direct link or button through which the consumer can cancel the subscription. Indeed, there is no button labeled "cancel" at all. Instead, to continue the process, the consumer must know to **(4)** click "Manage" in the top right corner of the Subscription Page. The Subscription Page is reproduced on the following page:

CLASS ACTION COMPLAINT



84.     Clicking "Manage" expands a menu with two items: an option to upgrade to a more expensive payment tier, or an item marked with a foreboding red "X" and labeled "Cancel subscription." The consumer must **(5)** click the "Cancel subscription" button to move forward with the cancellation process. A reproduction of the Subscription Page with this menu expanded is reproduced on the following page:



85.    But clicking "Cancel subscription" does not actually cancel the subscription. Instead, the consumer is presented with yet another pop-up, which offers two choices, a high-contrast white button, highlighted to draw the consumer's attention, advising the consumer to "Get help with an issue" and an unhighlighted button, with no contrast to its background, labeled "Cancel SuperGrok." To continue the cancellation process, the consumer must **(6)** click "Cancel SuperGrok"—the second time a consumer must click a button labeled "Cancel" to do so. This screen is reproduced on the following page:

24

CLASS ACTION COMPLAINT



86.    But clicking "Cancel SuperGrok" a second time *still* does not result in cancellation. Instead, the consumer is presented with *yet another* pop-up, asking the consumer "[a]re you sure you want to lose all your benefits?," displaying a list of SuperGrok's offerings, and offering the consumer a highlighted button to "Keep SuperGrok," while the "Continue to cancel" button is deemphasized with no contrast to its background. The consumer must **(7)** click "Continue to cancel" to move forward with the cancellation process—the third time a consumer must click a button labeled "Cancel" to do so. This pop-up is reproduced on the following page:



87.     But clicking a "cancel" button a third time *still* does not result in cancellation of the consumer's subscription. Instead, the consumer is taken to yet another page, labeled "Current Subscription" and cluttered with information unrelated to cancellation, including the consumer's payment method, billing information, and invoice history. Here, too, the consumer is presented with a highlighted button inviting them to abort the cancellation process ("Update Subscription," which takes the consumer to a page offering alternative plans), while the button that continues the cancellation process ("Cancel Subscription") is styled the same color as its background, increasing the chance that the consumer will overlook it. The consumer must **(8)** click the "Cancel Subscription" button to continue the cancellation process—the *fourth* time that a consumer must click a button labeled "cancel." A copy of the "Cancel Subscription" page is reproduced on the following page:

CLASS ACTION COMPLAINT

88.    But this *fourth* time a consumer clicks "cancel" *still* does not result in cancellation. Instead, the consumer is taken to *another* page, labeled "Confirm Cancellation." Here, however, the "Cancel Subscription" button is black whereas on the previous page it was white.  The white button is labeled "Go Back." To finally cancel the subscription, the consumer must **(9)** click "Cancel Subscription"—the *fifth* time the consumer must click a button labeled "Cancel" as part of the cancellation process. A copy of the "Confirm Cancellation" page is reproduced on the following page:

27



89.    To cancel their subscription, the consumer must thus navigate, at least, a **nine-step** process across at least **seven screens** and must affirmatively click "cancel" at least **five times**.

90.    The first four steps of X.AI's cancellation flow do not present the word "cancel" at all, instead requiring the consumer to ferret out the need to click unlabeled buttons or buttons generically labeled "Manage" to begin the byzantine cancellation gauntlet X.AI has set. *See supra* at ¶¶ 80–83 (Steps 1–4, requiring hovering over an unlabeled icon, clicking on an unlabeled button, and, at least once but up to twice, clicking a button labeled "Manage").

91.    Moreover, should the consumer accidentally click outside the pop-up windows at any time while completing steps 3–7, the pop-ups disappear, returning the consumer to the "grok.com" homepage and forcing the customer to restart the entire process from the beginning.

92.    X.AI sometimes adds even more steps to the process, inserting offers for discounts or other subscription plans in lieu of cancellation in between the steps identified above. Two exemplar pop-ups encouraging the customer to abandon cancellation are replicated below.

CLASS ACTION COMPLAINT

93.    The first pop-up invites the consumer to switch to a lower-priced subscription ("Stay super. Pay less.") rather than cancel, with the offer to abandon cancellation in favor of a new subscription again placed in high contrast to the background, while the option to cancel is written in small, red font.



94.    The second pop-up offers the consumer "3 months for the price of 1", including a brightly colored button inviting the consumer to "[c]laim my one-time offer" while relegating to the bottom of the page small red text permitting the consumer to "[l]ose offer and continue to cancel." A copy of this pop-up is reproduced on the following page:

CLASS ACTION COMPLAINT



95.    X.AI's cancellation flow is thus sometimes even longer than the ***nine-step***, ***seven-screen*** process described herein, which required the consumer to click "cancel" ***five times*** to cancel their subscription.[19]

96.    X.AI thus does not comply with the ARL's requirement to "allow a consumer to terminate the automatic renewal . . . exclusively online, at will, ***and without engaging any further steps that obstruct or delay the consumer's ability to terminate the automatic renewal . . . immediately***." ARL § 17602(d)(1) (emphasis added).

97.    X.AI also does not provide, as required under the ARL, a "method of termination that is online in the form of . . . a prominently located direct link or button which may be located within either

---

[19] The pop-ups described *supra* at ¶¶ 93–94 independently violate the ARL. While it is permissible for a business to "display a discounted offer, retention benefit, or information regarding the effects of cancellation" when "a consumer conveys a request to cancel by an online system," the business must "simultaneously" provide a prominently located cancellation button which, if utilized, causes the business to "promptly process the cancellation[.]" Cal. Bus. & Prof. Code § 17602(e)(2). However, neither of the cancellation buttons in the pop-ups described at ¶¶ 93–94 executed cancellation on their own. Instead, the customer had to take multiple further steps to cancel their subscription, which is impermissible under the ARL.

30

CLASS ACTION COMPLAINT

a customer account or profile, or within either device or user settings." *Id.* § 17602(d)(1)(A). Instead, the consumer must click five separate cancellation buttons to actually cancel, and the first of those buttons is not "prominently located" but buried within a generically labeled "manage" button, which is itself buried two layers deep into X.AI's Settings Page.

98.    Nor does X.AI provide an "immediately accessible termination email formatted and provided by the business that a consumer can send to the business without additional information." *Id.* § 17602(d)(1)(B).

**F.    X.AI Does Not Send an ARL-Required Post-Purchase Acknowledgment Email.**

99.    Under the ARL, X.AI must provide a post-purchase acknowledgment "that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer." Cal. Bus. & Prof. Code § 17602(a)(3).

100.    Moreover, if the automatic renewal offer includes a free trial, the post-purchase acknowledgment must explain "how to cancel, and allow the consumer to cancel, the automatic renewal or continuous service before the consumer pays for the goods or services." *Id.*

101.    During the time that Plaintiff was an X.AI customer and during the relevant period, counsel's investigation shows that X.AI may have failed to send consumers a compliant post-purchase acknowledgment, including, upon information and belief, by failing to send any acknowledgment whatsoever.

102.    On information and belief, for automatically renewing subscriptions with initial terms of 1 year or longer, X.AI also does not provide a pre-renewal notice of upcoming renewal between 15 and 45 days prior to the date of renewal.

31

CLASS ACTION COMPLAINT

## G.    X.AI's History of Injurious Billing and Cancellation Practices.

103.    X.AI's actions have harmed consumers throughout California and beyond, resulting in legions of customers voicing their discontent online. Below is a small sampling of negative reviews left by subscribers on TrustPilot regarding X.AI's underhanded subscription practices:[20]



**Grok itself is a decent LLM, Customer Support trash**

Grok itself is a decent LLM. However support is terrible, you have to press cancel subscription 8 times for it to actually cancel, first time i clicked multiple times and for some reason it didnt cancel, i saw money being deducted so contacted support that same hour to cancel and refund me since i already inititate cancelation before. Has been more than a week, havent heard a response from support. would expect better from company ran by Musk....

email and my "Team ID". But there is no team ID, since I have a solo account - and you can bet the ranch they know it! Not to worry, Mr. Musk - I just kissed my $30 goodbye!

AVOID !!!!!
User interface is clunky and results take ages to generate !
Worst part is that when you want to cancel a Free Trail they take you through (6) pages !!!! asking you to keep it until you can actually cancel it !!
Yet another American Capitalist Scam !!!



**THIEVES!**

I cancelled my subscription, then scheduled my account for deletion, I didn't access it since then.
Everyday since then, they try to charge me $30 god knows for what.
Today I forgot my online payment feature On, and they took my money, $30 was stolen from my bank account.
What's more, is that Stripe STILL trying to charge me for the X thieves after the stolen money.
I have no idea if I'll ever get my money back now.

---

[20] Grok Reviews, TrustPilot, https://www.trustpilot.com/review/grok.com?topics=cancellation (last accessed June 8, 2026).



**I had a very disappointing experience...**

I had a very disappointing experience with this service. I signed up for what was presented as a free trial on Friday, with no clear indication of when the trial would end. Based on a normal understanding of a 3-day trial, I cancelled on Monday within that period—yet I was still charged.

There was no proper email confirmation, no reminder, and no clear disclosure of the exact billing timing. I've also made multiple attempts to contact the company, and they have completely ignored me.

This experience has left me feeling misled and honestly defrauded. I only trusted this app because it was available on the Apple App Store, but this situation shows a serious lack of transparency and accountability.

I would strongly caution others before signing up.



**They make it impossible to cancel the...**

They make it impossible to cancel the Grok Subscription on X or their website. They keep charging your card and sending messages they couldn't collect the $30 subscription. When you send email to support NO ONE ever replies. I cancelled 2 days before my Grok subscription ended. They never acknowledged the cancelation by email and I'm currently accruing bank charges every day as they ignore my emails and retry payment daily.

It's painful and frustrating dealing with X or Grok as your complaints fall on deaf ears.

104.    Large numbers of consumers have also posted to Reddit, pleading for assistance navigating X.AI's cancellation flow, only to find other consumers complaining of the same issues, or requiring multiple attempts or even specialized browsers to cancel. A copy of one such Reddit thread is

CLASS ACTION COMPLAINT

reproduced on the following page, as are other posts from frustrated customers unable to cancel their subscriptions[21,22,23,24,25]:

---

[21] Reddit (r/grok), *Can't Cancel Grok*, https://www.reddit.com/r/grok/comments/1s6e6oe/cant_cancel_grok/ (last visited June 11, 2026).

[22] Reddit (r/grok), *Warning — Check Your Cancellation!*, https://www.reddit.com/r/grok/comments/1s1p3ne/warning_check_your_cancellation/ (last visited June 11, 2026).

[23] Reddit (r/grok), *How to Cancel SuperGrok from Website?*, https://www.reddit.com/r/grok/comments/1s13hkm/how_to_cancel_supergrok_from_website/ (last visited June 11, 2026).

[24] Reddit (r/grok), *How Do I Cancel a 3 Month Grok Subscription?* (2026), https://www.reddit.com/r/grok/comments/1safast/how_do_i_cancel_a_3_month_grok_subscription/

[25]   Reddit (r/grok), *How to Cancel Your Super Grok Subscription After Accepting Two Extra Months for the Price of One????* (2026), https://www.reddit.com/r/grok/comments/1s50cma/how_to_cancel_your_super_grok_subscription_after/.

34



CLASS ACTION COMPLAINT



**r/grok** · 3mo ago                                                                    ...

## Warning - Check your cancellation!

I cancelled Super Grok 2 days ago. Today, I signed into my account and saw it was set to renew on the 3rd of the month, as it does every month.

This doesn't feel like a user error or a software glitch. Make sure your cancellation request is actually honored. This company deserves zero trust.



**r/grok** · 3mo ago                                                                    ...

## How to cancel supergrok from website?

I want to cancel super grok, but when you press cancel subscription on the website just send u to the bill details page. But there is no cancel button.



←  **r/grok** · 2mo ago                                                                    ...

## How do I cancel a 3 month Grok subscription?

Discussion

As of yesterday, I couldn't generate any videos at all. Went to cancel my subscription, got a "would you like to extend your subscription for an addition 3 months for $1.42?" offer. I thought "sure, I can see if anyone comes up with a workaround, and more importantly, I can just cancel the three month subscription right away".

Except I can't. Trying to cancel it bring me to https://billing.stripe.com/ and I don't see any option to cancel.

**r/grok** · 2mo ago                                                                    ...

## How to cancel your Super Grok subscription after accepting two extra months for the price of one????

As the title says, it takes me to Stripe, but I can't seem to cancel Supergrok! However, there's an unpaid $30 invoice listed among the invoices—maybe that's why? It seems absurd to me, considering that you pay by the day, not by the month, in advance... I even tried a different browser, but nothing worked. Any suggestions? This is so weird.

36

**H.**     **X.AI's Scheme Injured Plaintiff.**

105.    Mr. Rose paid $30.00 for a one-month SuperGrok Subscription on or around July 12, 2025.

106.    X.AI did not clearly and conspicuously disclose to Mr. Rose that he was purchasing an automatically renewing subscription. X.AI did not clearly and conspicuously disclose to Mr. Rose that the subscription would continue until cancelled. X.AI did not clearly and conspicuously, and in visual proximity to the request for consent, disclose to Mr. Rose the description of the cancellation policy that applied to X.AI's offer. X.AI did not clearly and conspicuously, and in visual proximity to the request for consent, disclose to Mr. Rose the recurring charges that would be charged to his payment method and that the amount of the charge may change. And X.AI did not clearly and conspicuously, and in visual proximity to the request for consent, disclose to Mr. Rose the length of the automatic renewal term.

107.    Dissatisfied with his SuperGrok Subscription, Mr. Rose attempted to cancel his Subscription through his web browser and on the Grok App prior to the end of his one-month Subscription term.

108.    However, X.AI's cancellation process was so difficult, lengthy, and confusing that Mr. Rose was unable to cancel.

109.    After Mr. Rose tried to cancel his subscription, X.AI charged Mr. Rose $30.00 on or about August 12th, September 12th, and October 12th of 2025 without authorization.

110.    Mr. Rose was injured by X.AI's failure to provide either a prominently located direct link or button with which a consumer can cancel or an immediately accessible termination email formatted and provided by the business that a consumer can send to the business without additional information. Cal. Bus. & Prof. Code § 17602(d)(1).

111. Mr. Rose was also injured by X.AI's failure to provide a post-purchase acknowledgment email which provided "information regarding how to cancel in a manner that is capable of being retained by the consumer." Cal. Bus. & Prof. Code § 17602(a)(3).

112. Mr. Rose was also injured by X.AI's subscription practices because, had he known the truth about X.AI's intentionally misleading subscription practices, he would not have purchased a SuperGrok Subscription.

113. Mr. Rose intends to purchase products and services in the future for himself from artificial intelligence companies, including potentially those offered by X.AI, as long as he can gain some confidence in X.AI's representations about its products and services and subscription practices. Moreover, X.AI still has Mr. Rose's payment information and could use it to process unauthorized payments in the future.

## RULE 9(B) ALLEGATIONS

114. To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

115. **WHO**: X.AI sells services to consumers in California and nationwide through a deceptive and unlawful subscription scheme by making the material misrepresentations and omissions alleged in detail above in violation of California consumer protection statutes and the common law, including with respect to X.AI's automatic renewal policy and cancellation process, leaving many consumers who sign up for an X.AI service paying for subscriptions that they do not want.

116. **WHAT**: X.AI misrepresented and omitted material facts concerning the SuperGrok Subscriptions. Among other things, X.AI failed to clearly and conspicuously disclose, and failed to disclose in visual proximity to the request for consent, that the SuperGrok Subscription would automatically renew unless cancelled; the cancellation policy applicable to the offer, including how the consumer could cancel; the recurring charges that would be charged to the consumer's payment method; that the amount of the recurring charge may change; and the length of the automatic renewal term or

38

that the service is continuous. X.AI further misrepresented and omitted material facts by presenting consumers with a prominent "3 days free" offer and a "Start trial" button while relegating any purported renewal language to small, low-contrast text that did not disclose the full automatic renewal terms and did not link to X.AI's automatic renewal terms. X.AI also represented that consumers could "cancel anytime," while failing to disclose that cancellation required navigating a lengthy, confusing, multi-step process that obstructed and delayed cancellation. X.AI did not provide a prominently located link through which a consumer can cancel or an immediately accessible termination email formatted and provided by the business that a consumer can send to the business without additional information.

117.    **WHERE**: X.AI's deceptive and unlawful subscription scheme is conducted through its website, mobile/tablet/desktop applications, and electronic communications with customers.

118.    **WHEN**: X.AI has been engaging in its deceptive and unlawful subscription scheme since at least February 2025, when X.AI first began selling paid subscriptions for SuperGrok. For example, X.AI used its deceptive and unlawful subscription scheme when Plaintiff enrolled in a SuperGrok Subscription in July 2025, when he attempted to cancel thereafter, and when X.AI charged him for renewal without authorization.

119.    **WHY**: X.AI uses its deceptive and unlawful subscription scheme to trap its customers into paying for X.AI subscriptions. As a direct result of this scheme, X.AI has successfully reaped millions of dollars in unlawful charges at the expense of unsuspecting customers.

120.    **HOW**: X.AI conducts its deceptive and unlawful subscription scheme by making the material misrepresentations and omissions; by deliberately imposing a confusing and deceptive cancellation process; and by failing to provide compliant notices to subscribers acknowledging their purchase, all in violation of California consumer protection law, federal law, and the common law as alleged in detail above.

## CLASS ACTION ALLEGATIONS

121.    Plaintiff brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class that is preliminarily defined as all X.AI customers in the United States (including customers of companies to which X.AI acts as a successor) who were automatically renewed and charged for at least one month of a SuperGrok

39

Subscription at any time from the applicable statute of limitations period to the date of judgment (the "Nationwide Class").

122.    Plaintiff also brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class that is preliminarily defined as all X.AI customers nationwide (including customers of companies to which X.AI acts as a successor) who were automatically renewed and charged for at least one month of a SuperGrok Subscription and, as a result of that enrollment, were charged by X.AI for at least one month of that Subscription by debit card or other electronic fund transfer from a bank account, at any time from the applicable statute of limitations period to the date of judgment (the "EFTA Class").

123.    Plaintiff also brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class that is preliminarily defined as all X.AI customers in California (including customers of companies X.AI acts as a successor to) who were automatically renewed and charged for at least one month of a SuperGrok Subscription at any time from the applicable statute of limitations period to the date of judgment (the "California Subclass").

124.    As alleged throughout this Complaint, the claims of the Nationwide Class, EFTA Class, and California Subclass's all derive directly from a single course of conduct by X.AI. X.AI has engaged in uniform and standardized conduct toward the Nationwide Class, EFTA Class, and California Subclass and this case is about the responsibility of X.AI, at law and in equity, for its knowledge and conduct in deceiving its customers. X.AI's conduct did not meaningfully differ among individual Class Members in its degree of care or candor, its actions or inactions, or in its false and misleading statements or omissions. The objective facts on these subjects are the same for all Class Members.

125.    Excluded from the Nationwide Class, EFTA Class, and California Subclass are: X.AI; any parent, subsidiary, or affiliate of X.AI; any entity in which X.AI has or had a controlling interest, or which X.AI otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of X.AI. Also excluded are federal, state and local government entities; and any judge, justice, or judicial officer presiding over this action and the members of their immediate families and judicial staff.

40

CLASS ACTION COMPLAINT

126.    Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Nationwide Class, EFTA Class, or California Subclass and/or add Subclasses, when Plaintiff files his motion for class certification.

127.    Plaintiff does not know the exact size of the Nationwide Class, EFTA Class, or California Subclass since such information is in the exclusive control of X.AI. Plaintiff believes, however, that the Nationwide Class, EFTA Class, and California Subclass encompass thousands of consumers whose identities can be readily ascertained from X.AI's records. Accordingly, the members of the Nationwide Class, EFTA Class, and California Subclass are so numerous that joinder of all such persons is impracticable.

128.    The Nationwide Class, EFTA Class, and California Subclass are ascertainable because their members can be readily identified using data and information kept by X.AI in the usual course of business and within its control. Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

129.    Plaintiff is an adequate class representative. Plaintiff's claims are typical of the claims of the Nationwide Class, EFTA Class, and California Subclass and do not conflict with the interests of any other members of the Nationwide Class, EFTA Class, and California Subclass. Plaintiff and the other members of the Nationwide Class, EFTA Class, and California Subclass were subject to the same or similar conduct engineered by X.AI. Further, Plaintiff and members of the Nationwide Class, EFTA Class, and California Subclass sustained substantially the same injuries and damages arising out of X.AI's conduct.

130.    Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent his interests and those of the Nationwide Class, EFTA Class, and California Subclass.

131.    Questions of law and fact are common to the Nationwide Class, EFTA Class, and California Subclass and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

  a.    Whether X.AI's conduct violates the ARL;

41

b.  Whether X.AI's conduct violates the applicable California consumer protection statutes;

c.  Whether X.AI's conduct violates the EFTA;

d.  Whether X.AI's conduct violates the applicable common law doctrines;

e.  Whether X.AI was unjustly enriched as a result of its conduct;

f.  Whether Class Members have been injured by X.AI's conduct;

g.  Whether, and to what extent, equitable relief should be imposed on X.AI to prevent it from continuing its unlawful practices; and

h.  The extent of class-wide injury and the measure of damages for those injuries.

132.  A class action is superior to all other available methods for resolving this controversy because (1) the prosecution of separate actions by Nationwide Class, EFTA Class, and California Subclass Members will create a risk of adjudications with respect to individual Nationwide Class, EFTA Class, and California Subclass Members that will, as a practical matter, be dispositive of the interests of the other Nationwide Class, EFTA Class, and California Subclass Members not parties to this action, or substantially impair or impede their ability to protect their interests; (2) the prosecution of separate actions by Nationwide Class, EFTA Class, and California Subclass Members will create a risk of inconsistent or varying adjudications with respect to individual Nationwide Class, EFTA Class, and California Subclass Members, which will establish incompatible standards for X.AI's conduct; (3) X.AI has acted or refused to act on grounds generally applicable to all Nationwide Class, EFTA Class, and California Subclass Members; and (4) questions of law and fact common to the Nationwide Class, EFTA Class, and California Subclass predominate over any questions affecting only individual Class Members.

133.  Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

a.  Whether X.AI's conduct violates the ARL;

b.  Whether X.AI's conduct violates the applicable California consumer protection statutes;

c.  Whether X.AI's conduct violates the EFTA;

d.  Whether X.AI's conduct violates the applicable common law doctrines;

     e.     Whether X.AI was unjustly enriched as a result of its conduct;

     f.     Whether Nationwide Class, EFTA Class, and California Subclass Members have been injured by X.AI's conduct; and

     g.     Whether, and to what extent, equitable relief should be imposed on X.AI to prevent it from continuing its unlawful practices.

134.     Accordingly, this action satisfies the requirements set forth under Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

## COUNT I

### CALIFORNIA FALSE ADVERTISING LAW

**(on behalf of the California Subclass)**

135.     Plaintiff incorporates by reference all preceding and subsequent paragraphs.

136.     Plaintiff brings this claim on his own behalf and on behalf of each member of the California Subclass.

137.     The FAL authorizes a private right of action for a violation of the ARL. *See Arnold v. Hearst Magazine Media, Inc.*, No. 19 Civ. 1969, 2021 WL 488343, at *6 (S.D. Cal. Feb. 10, 2021) ("A consumer who has been harmed by a violation of the ARL may bring a claim pursuant to other consumer protection statutes, including the FAL, CLRA, and UCL.").

138.     The acts, omissions, nondisclosures, and misleading statements by X.AI detailed herein were contrary to the provisions of the False Advertising Law, Cal. Bus. & Prof. Code § 17500 and constitute violations of the UCL for that reason as well.

139.     These same acts, omissions, nondisclosures, and misleading statements violated Section 17602 of the Cal. Bus. & Prof. Code (the ARL), as alleged in detail above.

140.     X.AI knew or reasonably should have known that its acts, omissions, nondisclosures, and misleading statements were misleading to reasonable consumers.

141.     Plaintiff relied upon X.AI's misleading representations and omissions, as detailed above. X.AI's misrepresentations were a substantial factor in Plaintiff's purchase decision. If Plaintiff had known about X.AI's deceptive subscription scheme, he would not have purchased a SuperGrok Subscription. For example, X.AI omitted that a SuperGrok Subscription is extremely difficult to cancel, and that cancellation requires navigating a nine-step process designed to frustrate a consumer's desire

to cancel their subscription. Had Plaintiff known that X.AI's cancellation process was so designed, he would not have purchased a SuperGrok Subscription.

142. Because X.AI's misrepresentations and omissions were material, class-wide reliance may be inferred. These misrepresentations and omissions are material because a reasonable consumer would consider them when deciding whether to buy a SuperGrok Subscription. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) ("That one would have behaved differently can be presumed, or at least inferred, when the omission is material.") (citation omitted).

143. As a result of X.AI's violations of the FAL, Plaintiff and the California Subclass suffered an injury in fact and lost money or property, or were deprived of access to money or property for a period of time.

## COUNT II

### CALIFORNIA UNFAIR COMPETITION LAW—UNLAWFUL BUSINESS PRACTICES

### (on behalf of the California Subclass)

144. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

145. Plaintiff brings this claim on his own behalf and on behalf of each member of the California Subclass.

146. Cal. Bus. & Prof. Code § 17200 *et seq.* (the "Unfair Competition Law" or "UCL") prohibits acts of "unfair competition," including any unlawful, fraudulent or unfair business acts or practices as well as any acts contrary to the requirements of Cal. Bus. & Prof. Code § 17500.

147. Under the "unlawful" prong of the UCL, a violation of another law is treated as unfair competition and is independently actionable.

148. X.AI committed unlawful business practices under the UCL because it imposed charges without complying with all applicable requirements of Cal. Bus. & Prof. Code §§ 17600 *et seq.*, as alleged above.

149. As a result of X.AI's unlawful business practices, Plaintiff and the California Subclass suffered an injury in fact and lost money or property, or were deprived of access to money or property for a period of time.

150.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and the California Subclass are entitled to an order: (1) requiring X.AI to make restitution to Plaintiff and the California Subclass; (2) enjoining X.AI from charging Plaintiff's and California Subclass Members' credit cards, debit cards, and/or third-party payment accounts until such time as X.AI obtains the consumer's affirmative consent to an agreement that contains clear and conspicuous disclosures of all automatic renewal or continuous service offer terms and meets all other legal requirements; and (3) enjoining X.AI from making automatic renewal or continuous service offers in the State of California that do not comply with the California Automatic Renewal Law.

## COUNT III

### CALIFORNIA UNFAIR COMPETITION LAW–UNFAIR BUSINESS PRACTICES

#### (on behalf of the California Subclass)

151.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

152.    Plaintiff brings this claim on his own behalf and on behalf of each member of the California Subclass.

153.    The Unfair Competition Law prohibits acts of "unfair competition," including any unlawful, fraudulent or unfair business acts or practices.

154.    California courts have adopted differing tests for determining whether a business act or practice is "unfair" under the UCL.  X.AI's practices as alleged above were and are "unfair" and therefore violated the UCL under any and all of these tests.  X.AI's practices have resulted in substantial injury to consumers that was not outweighed by any countervailing benefits to consumers or to competition and was not reasonably avoidable by the consumers themselves.  Alternatively, X.AI's practices offended an established public policy and/or were immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.  Alternatively, X.AI's practices were contrary to a public policy "tethered" to a specific constitutional, statutory or regulatory provision.

155.    As a result of X.AI's unlawful, unfair, and fraudulent business practices, Plaintiff and the California Subclass suffered an injury in fact and lost money or property, or were deprived of access to money or property for a period of time.

45

156.   Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and the California Subclass are entitled to an order: (1) requiring X.AI to make restitution to Plaintiff and the California Subclass; (2) enjoining X.AI from charging Plaintiff's and California Subclass Members' credit cards, debit cards, and/or third-party payment accounts until such time as X.AI obtains the consumer's affirmative consent to an agreement that contains clear and conspicuous disclosures of all automatic renewal or continuous service offer terms and meets all other legal requirements; and (3) enjoining X.AI from making automatic renewal or continuous service offers in the State of California that do not comply with the California Automatic Renewal Law.

## COUNT IV

### CALIFORNIA UNFAIR COMPETITION LAW–FRAUDULENT PRACTICES

### (on behalf of the California Subclass)

157.   Plaintiff incorporates by reference all preceding and subsequent paragraphs.

158.   Plaintiff brings this claim on his own behalf and on behalf of each member of the California Subclass.

159.   The Unfair Competition Law prohibits acts of "unfair competition," including any unlawful, fraudulent or unfair business acts or practices as well as any acts contrary to the requirements of Cal. Bus. & Prof. Code § 17500.

160.   X.AI's acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public, and thus constituted fraudulent business practices in violation of the UCL.

161.   Plaintiff relied upon X.AI's misleading acts, omissions, nondisclosures, and statements, as detailed above.

162.   As detailed above, because those acts, omissions, nondisclosures, and statements were material, reliance by the Class can be inferred.

163.   As a result of X.AI's unlawful and unfair business practices, Plaintiff suffered an injury in fact and lost money or property, or were deprived of access to money or property for a period of time.

164.   Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and the California Subclass are entitled to an order: (1) requiring X.AI to make restitution to Plaintiff and the California Subclass; (2)

46

enjoining X.AI from charging Plaintiff's and California Subclass Members' credit cards, debit cards, and/or third-party payment accounts until such time as X.AI obtains the consumer's affirmative consent to an agreement that contains clear and conspicuous disclosures of all automatic renewal or continuous service offer terms and meets all other legal requirements; and (3) enjoining X.AI from making automatic renewal or continuous service offers in the State of California that do not comply with the California Automatic Renewal Law.

## COUNT V

### CALIFORNIA CONSUMERS LEGAL REMEDIES ACT[26]

### (on behalf of the California Subclass)

165.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

166.    Plaintiff brings this claim on his own behalf and on behalf of each member of the California Subclass.

167.    The California Consumers Legal Remedies Act (the "CLRA"), Cal. Civ. Code § 1770(a)(14), prohibits "[r]epresenting that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law."

168.    As alleged in detail above, X.AI violated and continues to violate Cal. Civ. Code § 1770, subds. (a)(5), (a)(9), (a)(14) and (a)(16) by, *inter alia*, representing that X.AI's goods and services have certain characteristics that they do not have; advertising goods and services with the intent not to sell them as advertised; representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law; representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not; and representing that X.AI has the right to charge Plaintiff and the California Subclass's payment methods without first making the statutorily required disclosures under California's Automatic Renewal Law and obtaining their affirmative consent to the agreement containing the automatic renewal terms and

[26] Pursuant to Cal. Civ. Code § 1782, Plaintiff shall send a notice and demand letter by registered mail to X.AI.

continuous service offer terms, and through other conduct described above, in violation of California's Automatic Renewal Law.  X.AI does not have the legal right to charge for these subscriptions because at all relevant times, it was not in compliance with California's Automatic Renewal Law.

169.    Plaintiff and the Class Members are "consumers" within the meaning of Cal. Civ. Code § 1761(d) in that Plaintiff and members of the California Subclass were charged by X.AI in connection with transactions involving goods or services sought or acquired for personal, family, or household purposes.

170.    X.AI's automatically renewing subscriptions constitute "goods or services" within the meaning of Cal. Civ. Code § 1761.

171.    Plaintiff has standing to pursue these claims because he suffered injury in fact and a loss of money and/or property as a result of the wrongful conduct alleged herein.  Plaintiff would not have enrolled in X.AI's subscription had he known the truth about X.AI's intentionally misleading subscription practices.

172.    The charges imposed by X.AI, purportedly in exchange for automatically renewing subscriptions, on Plaintiff and California Subclass Members are "transactions" within the meaning of Cal. Civ. Code § 1761(e).

173.    As a direct and proximate result of X.AI's violations of the CLRA, Plaintiff and the California Subclass were wrongfully charged fees for X.AI's automatically renewing subscriptions.

174.    Plaintiff and the California Subclass reasonably relied on X.AI's deceptive acts, omissions, nondisclosures, and statements, as detailed above.

175.    X.AI's conduct alleged herein was undertaken knowingly, willfully, and with oppression, fraud, and/or malice, within the meaning of Cal. Civ. Code § 3294(c).

176.    X.AI knew, or should have known, that its deceptive acts, omissions, nondisclosures, and statements were likely to mislead consumers.

177.    Accordingly, Plaintiff and members of the California Subclass seek an injunction prohibiting X.AI from engaging in the unlawful practices alleged herein. If X.AI fails to rectify or agree to rectify the unlawful acts detailed above and fails to give notice to all affected consumers within 30 days of written notice pursuant to § 1782 of the CLRA, Plaintiff will amend this Complaint to add claims

48

for compensatory damages, and restitution of any ill-gotten gains due to X.AI's acts and practices, as well as any other remedies the Court may deem appropriate.

## COUNT VI

### ELECTRONIC FUND TRANSFER ACT

### (on behalf of the EFTA Class)

178. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

179. Plaintiff brings this claim on his own behalf and on behalf of each member of the EFTA Class.

180. The Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693 *et seq.*, was enacted "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems" and the "primary objective of this subchapter, however, is the provision of individual consumer rights." *Id.* § 1693(b).

181. Any waiver of EFTA rights is void. "No writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by this subchapter." 15 U.S.C. § 1693l.

182. Plaintiff and members of the Class are "consumers" and maintained an "account," as defined by the EFTA.  15 U.S.C. § 1693a(2), (6).

183. X.AI's transfers of monies via debit card from the bank accounts of Plaintiff and EFTA Class Members are "electronic fund transfers" within the meaning of the EFTA and the EFTA's implementing regulations, known as Regulation E and codified at 12 C.F.R. §§ 205, et seq.

184. An "electronic fund transfer" means "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). The term expressly includes "[t]ransfers resulting from debit card transactions, whether or not initiated through an electronic

terminal." 12 C.F.R. § 205.3(b)(v).

185.    The EFTA defines the term "preauthorized electronic fund transfer" as "an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(9). The Official Staff Interpretation of Regulation E describes a "preauthorized electronic transfer" as "one authorized by the consumer in advance of a transfer that will take place on a recurring basis, at substantially regular intervals, and will require no further action by the consumer to initiate the transfer." 12 C.F.R. Part 1005, Supp. I, § 1005.2(k), cmt. 1.

186.    The EFTA prohibits preauthorized electronic transfers without written authorization. "A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693e(a).

187.    X.AI took funds from bank accounts managed by Plaintiff and the EFTA Class Members via debit card. In none of these instances did X.AI obtain Plaintiff or EFTA Class Members' written authorizations, nor did X.AI provide Plaintiff or the EFTA Class Members with copies of any such written authorizations.

188.    As stated in the Official Staff Interpretation of Regulation E, "when a third-party payee," such as X.AI, "fails to obtain the authorization in writing or fails to give a copy to the consumer . . . it is the third-party payee that is in violation of the regulation." 12 C.F.R. Part 1005, Supp. I, § 1005.10(b), cmt. 2.

189.    As a direct and proximate result of X.AI's violations of the EFTA and Regulation E, Plaintiff and Members of the EFTA Class have suffered damages in the amount of the unauthorized debits taken by X.AI. 15 U.S.C. § 1693m.

190.    Plaintiff and the Members of the EFTA Class are thus entitled to recover statutory damages in the amount of "the lesser of $500,000 or 1 per centum of the net worth of the defendant."

CLASS ACTION COMPLAINT

*Id.* § 1693m(a)(2)(B).

191.    Plaintiff and Members of the EFTA Class are also entitled to recover costs and attorneys' fees. *Id.* § 1693m(a)(3).

## COUNT VII

### CONVERSION

### (on behalf of the Nationwide Class)

192.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

193.    Plaintiff brings this claim on his own behalf and on behalf of each member of the Nationwide Class.

194.    Plaintiff and the Nationwide Class own and have a right to possess the money that is in their respective bank accounts, internet payment accounts, and/or credit cards.

195.    Defendants substantially interfered with Plaintiff and the Nationwide Class's possession of this money by knowingly and intentionally making unauthorized charges to their bank accounts, internet payment accounts, and/or credit cards for X.AI subscriptions.

196.    Plaintiff and the Nationwide Class never consented to Defendants' taking of this money from their bank accounts, internet payment accounts, and/or credit cards.

197.    Defendants wrongfully retained dominion over this monetary property and/or the time value of the monetary property.

198.    Plaintiff and the Nationwide Class have been damaged by Defendants' wrongful taking and/or possession of such money from their bank accounts, internet payment accounts, and/or credit cards in an amount that is capable of identification through Defendants' records.

199.    By reason of the foregoing, Defendants are liable to Plaintiff and the Nationwide Class for conversion in an amount to be proved at trial.

## COUNT VIII

### UNJUST ENRICHMENT

### (on behalf of the Nationwide Class)

200.    Plaintiff incorporates by reference all preceding and subsequent paragraphs.

51

CLASS ACTION COMPLAINT

201. Plaintiff brings this claim on his own behalf and on behalf of each member of the Nationwide Class.

202. As a result of their unjust conduct, Defendants have been unjustly enriched.

203. By reason of Defendants' improper conduct, Defendants have benefited from the receipt and maintenance of improper funds, and under principles of equity and good conscience, Defendants should not be permitted to keep this money.

204. As a result of Defendants' conduct it would be unjust and/or inequitable for Defendants to retain the benefits of its conduct without restitution to Plaintiff and the Nationwide Class. Accordingly, Defendants must account to Plaintiff and the Nationwide Class for their unjust enrichment.

## COUNT IX

### MONEY HAD AND RECEIVED

### (on behalf of the Nationwide Class)

205. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

206. Plaintiff brings this claim on his own behalf and on behalf of each member of the Nationwide Class.

207. Defendants received money from Plaintiff and from each member of the Nationwide Class.

208. The monies belong to Plaintiff and each member of the Nationwide Class.

209. Defendants have not returned the money.

210. Plaintiff, on behalf of himself and the members of the Nationwide Class, seeks the return of the money in an amount to be proved at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a) Issue an order certifying the Nationwide Class, EFTA Class, and Subclass defined above, appointing the Plaintiff as representative of the Nationwide Class, EFTA Class, and the California Subclass, and designating Long Law, P.C. and Wittels McInturff Palikovic as Class Counsel;

(b) Find that Defendants have committed the violations of law alleged herein;

52

(c)    Determine that Defendants have been unjustly enriched as a result of their wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Nationwide Class, EFTA Class, and Subclass;

(d)    Enter an order granting all appropriate relief, including injunctive relief, on behalf of the Nationwide Class, EFTA Class, and Subclass under the applicable laws;

(e)    Render an award of compensatory damages of at least $100,000,000, the exact amount of which is to be determined at trial;

(f)    Issue an injunction or other appropriate equitable relief requiring Defendants to refrain from engaging in the deceptive and unlawful practices alleged herein;

(g)    Declare that Defendants have committed the violations of law alleged herein;

(h)    Render an award of punitive damages;

(i)    Enter judgment including interest, reasonable attorneys' fees, costs, and expenses; and

(j)    Grant all such other relief as the Court deems appropriate.

Dated:  June 11, 2026

Sacramento, California

**LONG LAW, P.C.**

s/ *James Austin Long*
James Austin Long
1401 21st Street, Ste. 5801
Sacramento, CA 95811
Tel:    (315) 991-8000
jlong@long.law

**WITTELS MCINTURFF PALIKOVIC**
Daniel Kieselstein*
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Tel:    (914) 775-8862
djk@wittelslaw.com

*Co-Counsel for Plaintiff and the Proposed Class*

***Pro hac vice application forthcoming*

CLASS ACTION COMPLAINT